LOTTINGER, Judge.
This is a suit wherein the plaintiff seeks to recover from Norman W. Jarvis and The Home Indemnity Company, liability insurer of her husband Leroy B. Chase, the sum of $60,000 for personal injuries received in an automobile accident on Louisiana Highway No. 19 in the Parish of East Baton Rouge in Scotlandville on December 20, 1955.
The petition sets forth that on said date, at about seven o’clock P.M., petitioner was driving north on said highway as a guest passenger in an automobile owned and driven by her husband. Upon reaching the intersection of State Route No. 19 and what is known as the Progress Road, her husband slowed down, turned into the Progress Road, then backed onto No. 19, turned around and proceeded south in the direction from whence they had come. After proceeding some one and one-half blocks south from the aforesaid intersection, it is alleged, and while still in the southbound lane, either stopped or in the process of stopping, so as to visit plaintiff’s daughter who resided on the east side of the street, the Chase automobile was driven into from the rear causing the accident and physical injuries for which plaintiff seeks compensation. It is alleged that Jarvis was operating his vehicle at an excessive rate while under the influence of intoxicating liquor.
The defendant insurer, having first filed exceptions of no right and no cause of action which were overruled, then answered setting forth that the accident occurred when Chase was proceeding in the proper lane of travel at a normal rate of speed when he was struck from the rear by Jarvis, whose negligence is alleged to be the sole cause of the accident.
No appearance whatever was made by Jarvis. Trial on the merits was duly had with The Home Indemnity Company following which judgment was rendered in favor of the latter but which confirmed a preliminary default against Jarvis granting plaintiff judgment against him in the sum of $3,000. Jarvis has neither appealed nor answered the appeal and the matter is before us on an appeal taken by the plaintiff.
The case presents merely a question of fact and to resolve same we proceed to an analysis of the evidence.
The plaintiff, Bythelda G. Chase, gave a statement to an adjuster, Mr. Stanley H. Howes, on March 15, 1956 (introduced into evidence as Exhibit D-3), which contained the following:
“The headlights of our car were on when we turned around. * * * Leroy is always a careful driver. * * * When we turned around at the corner I had noticed a car coming South but it was a good distance from us at that time. * * * We had turned around and headed South and was in front of my daughter’s house getting ready to turn in and park in front of her car which was headed North. I think we were still in the South bound traffic lane and Leroy was slowing down to pull across the North bound traffic lane. * * * ”
The plaintiff’s deposition was taken on April 4, 1957. It was introduced as Exhibit D-2 and at page 7 thereof she gave the following testimony:
“Q. Now, when he first backed out, how far was the car that eventually hit him behind him, do you know?
*716 A. I wouldn’t have no way of knowing, but it wasn’t too far behind him.
“Q. He had plenty of time to back out, though, didn’t he? A. Well, that was my fear about it. I didn’t think he did. It wasn’t far enough.
“Q. How far south of Progress Road was your husband’s car when the other car ran into it? A. Well, he came to a stop. .
“Q. Who had come to a stop? A. My husband.”
Testifying on the trial of the case the plaintiff gave the following testimony:
"Q. Now what did you observe when you backed out into the street? A. I observed the car was coming.
“Q. Was the car very near? A. It was.
“Q. Now you testified that you had driven about a block, or that your husband rather had driven about a block and a half at the time that the accident occurred. Would you just tell the court whether or not the car was in motion or whether it had stopped? A. It had stopped.
“Q. Your husband had come to a complete stop? A. Yes.
* * * * * *
“Q. You testified that this automobile had stopped, the one in which you were riding had stopped; that is your husband’s automobile. Do you know whether or not he had cleared the pavement at the time he stopped? A. No he hadn’t.
“Q. He had not cleared the pavement? A. No.
“Q. He stopped on the pavement? A. Yes.
“Q. In what lane did he stop, in the north or south bound lane ? A. South bound lane.
* * * . * * *
“Q. Didn’t your husband tell you he was still moving at the time he got hit? A. I knew what he was doing at the time he got hit.
“Q. He was moving still, wasn’t he ? A. No, he wasn’t moving.
❖ * * * * *
“Q. Mrs. Chase did you notice your husband when he backed out? A. Yes I did.
“Q. Did you notice how far the car was behind him? A. Yes I noticed how far.
“Q. Was it very close or was it not? A. It seemed to be very close.”
The plaintiff’s husband Leroy B. Chase, likewise gave a written statement to the adjuster. It was introduced in evidence as Exhibit D-4 and contained, in part, the following:
“I was travelling south in my proper lane of traffic at about 25 M.P.H. attempting to go straight ahead when a car that was travelling south also, ran into the rear of my car. I had my lights on at the time of the accident.”
When Chase’s testimony was taken by deposition on April 4, 1957, he stated as follows:
“Q. Now, did you look to the north when you backed out? A. Yes, Sir.
“Q. Did you see anything coming? A. Yes, Sir, I seen a car coming.
“Q. Did you have enough time to back out safely? A. Correctly?
“Q. About how far away was that car? A. Well, I couldn’t say just how far, but you know I got a good distance —a block and a half before he hit me. Approximately a block and a half before he hit me.
“Q. You backed out and then you started off heading south again? A. That’s right.
*717 “Q. How fast were you going when you started heading south? A. Well, I guess around 20 or 25 miles, I reckon. It was a block and a half, and you know, I couldn’t go too fast.
“Q. I know that. How fast were you going at the time he hit you? A. Oh, well I imagine I was moving awful slow then. I couldn’t say exactly how fast I was going because I was almost — I was coming to a stop. I was looking, because some car was parking on the — my right side of the road, and I was trying to come on off on the neutral ground to park, hut the car hit just before I — turned to pull, the car hit me.”
During the trial Chase gave the following testimony:
“Q. Now what was the highest speed that you got up to after you had backed up and headed south again ? A. Well I wouldn’t just say, but I imagine around twenty or twenty-five miles. I reckon it was that fast, I don’t know, hut when I come to approaching to my daughter’s house I slowed down.
“Q. You didn’t have too far to go to get to your daughter’s house? A. No, sir, a block and a half.
“Q. Now what were you intending on doing? A. I intended to park over on the righthand side of the lane, because on the east side of the lane it was completely blocked with traffic. There were cars already parked there.
“Q. You couldn’t park on the east side? A. No, Sir.
“Q. You were looking for a place to park on the right? A. That’s right.
“Q. Did you look in your rear view mirror to see if that car was coming after you turned around? A. Well I could see the lights through the mirror, his lights. I mean when I was coming south.
“Q. You could see his lights? A. Yes, Sir.
“Q. Now did you or did you not pump your brakes in order to indicate that you were slowing down ? A. Sure, you have to do that.
“Q. You knew the car was behind you? A. Yes, Sir.
“Q. And did you pump your brakes ? A. Well to let him know that I was slowing down.
“Q. Now how fast were you going at the time he hit. you?. A. Well. I wouldn’t say. because I didn’t look. I couldn’t have been going much over five miles, or something like that.
“Q. You could have been going a little faster than that? A. ..No, Sir, I' couldn’t be going very much faster. I was slowing down to stop to look over on the right side to see if I could see a parking space.'
******
“Q. But hpw fast were you going Leroy? A. Well I just couldn’t tell, you, but I imagine when I pulled out I pulled out at around twenty or twenty-five I reckon, before I got to my daughter’s house, but I cut down along in there.
“Q. The police report shows estimated speed at moment of accident twenty-five. Do you recall what you told the policeman you were going at the time of the accident? A. Well it has been so long I couldn’t say exactly what I told them, but I know he asked me some questions but I don’t know, I couldn’t say exactly, tell you now exactly how fast I was going.
“Q. You would remember it better at that time, is that correct? A. Why sure I could remember it better.
“Q. Do you deny you told Mr. Howes you were going twenty-five miles per hour at the time a car ran *718 into you ? A. Well I wouldn’t deny it. If I told him that, or if he got it wrote down there, but I know I didn’t go five miles an hour from one corner to the other. I drove faster than that.
“Q. Well I am interested in finding out how fast you were going at the time of the accident. I will ask you this then, did you slow down suddenly ? A. Well yes, Sir, I slowed down suddenly.
“Q. Real suddenly? A. Well I didn’t come right down and stop, but I put my foot on my brakes.
“Q. How many times did you put your foot on your brakes? A. Well when I put them on there I kept them on there and just gradually held them down.
“Q. Did you pump them back and forth? A. No, Sir I didn’t do that. When I put my foot on the brakes I always hold them there and gradually push down on them.
“Q. Well now I want to know right now. This statement was taken by Stanley Howes on December 21st, 1955, in which you state as follows: T was travelling south in my proper lane of traffic at about twenty-five miles per hour attempting to go straight ahead when a car that was travelling south also ran into the rear of my car.’ Did you tell Mr. Howes that or not? A. I imagine I did if he’s got it wrote down there.
“Q. Did you tell the policeman at the time you got hit your estimated speed at the moment of the accident was twenty-five? A. Yes, Sir, if he’s got it wrote down there.”
The record is clear to the effect that the road is straight where the accident occurred and that on the evening of December 20, 1955, the weather was clear. There is uncontradicted testimony to the effect that the defendant Jarvis was intoxicated and driving at an excessive rate without regard to the safety of others. Undoubtedly his negligence was a proximate cause of the accident which leaves for determination whether or not Chase was likewise negligent and, if so, whether his negligence was also a proximate cause of the accident.
From the record as made up it appears to us that the Chases’ version of the accident varied considerably, depending on when it was given. Soon after the accident (and presumably before the apparently impecunious condition of Jarvis was known to these parties) the husband Chase was a good driver observing all of the rules of the road before and at the time of the accident. Subsequently, however, when it became apparent that a judgment would be of little value unless the accident was covered by insurance, a different situation appeared. Needless to say, the plaintiff bore the burden of proving negligence on the part of her husband and from the inconsistent and conflicting statements in the record we are unable to say that she carried that burden satisfactorily. The trial judge was apparently not willing to accept these parties’ testimony nor do we. There were no skid or tire marks made by either vehicle which indicates that the Chase car was not suddenly stopped if it was at a standstill at the time of the impact.
The judgment cannot be amended insofar as Norman W. Jarvis is concerned as he has neither appealed nor answered the appeal.
For the reasons assigned, the judgment appealed from is affirmed.
Judgment affirmed.